UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert D. POLLACK, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth N. DELLAMATER,
Defendant-Appellant.

Nos. 73-3218, 73-3363.

United States Court of Appeals,
Ninth Circuit.

Aug. 27, 1974.

Leslie A. Kast (appeared), West Covina, Cal., for appellant in 73-3218.

David Elson (argued), of Simon, Sheridan, Murphy, Thornton & Hinerfeld, Los Angeles, Cal., for appellant in 73–3363.

Thomas E. Kotoske, Asst. U. S. Atty., (argued), Los Angeles, Cal., for appellee.

## OPINION

Before CHAMBERS and CARTER, Circuit Judges, and SCHWARTZ,* District Judge.

JAMES M. CARTER, Circuit Judge:

This is an appeal from the judgment of conviction on one count of conspiracy to violate and two counts of counselling and inducing a violation of 18 U.S.C. § 1005, which proscribes making, drawing, issuing, putting forth, or assigning any banking document or obligation without authority. We reverse.

## I. FACTS

Defendants Robert D. Pollack ("Pollack") and Kenneth N. Dellamater ("Dellamater") agreed to engage in a business venture to salvage abandoned communication cables from the ocean floor off the coast of California, and the Pacific and Gulf of Mexico coasts of Panama in Central America. Together, they formed the Oceanographic Geophysical Corporation ("OGC") to conduct the California salvage operations, and Oceantech Panama, Inc. ("Oceantech") to conduct salvage operations off the Panamanian Coast.

Pollack had an extensive background in oceanographic and marine engineering and was to be in charge of the salvage operations. Dellamater was an attorney and was therefore to perform the legal work for the corporations. They hired Marvin Hopkins, a former ship captain for the University of California's Scripps Institute of Oceanography, to direct the actual exploration and salvaging operations.

Although the California operations were largely abandoned after failure to obtain a federal permit for OGC, Pollack went to Panama on three separate occasions in 1970 to investigate the potential for a cable-salvaging operation and to secure the Panamanian government's permission to conduct the operations.

The violations charged arise from the efforts of Pollack and Dellamater to obtain financing for the Panamanian operation, primarily through Edward Snead, an assistant vice-president of the International Branch of the Bank of America in Los Angeles, and an unindicted conspirator in this case. Snead's job as lending officer included actively attempting to develop business for the Bank and during 1970 Dellamater discussed OGC and Oceantech with Snead on a number of occasions following their introduction.

After a series of negotiations, a financing arrangement was set up whereby the Bank of America would fund the cable-salvaging operations through its Los Angeles International Office, and would look to a "standby" letter of credit from the Chase Manhattan Bank in New York City, secured by securities deposited by a group of investors in Washington, D.C. ("Mortgage Investors, Investors, Inc."). Bank of America, however, required that the standby letter of credit, to which it would look to secure its own $5,000,000 line of credit in favor of OGC and Oceantech, would be renewable for ten years on an annual basis, at the option of the Bank of America. Mortgage Investors, Inc. had arranged for the Chase Manhattan Bank to guarantee to reimburse the Bank of America up to $5,000,000, but only at *the end of the ten years.* Therefore, this financing arrangement fell through.

On January 8, 1971, in response to an application signed by Pollack and Dellamater, a $90,000 letter of credit was issued by Snead in favor of Oceantech, the letter having been countersigned by

---

* Honorable Edward J. Schwartz, Chief Judge, United States District Court, Southern District of California, sitting by designation.

another officer of the International Branch. It contained a "100 per cent Red Clause," in effect making it unsecured. This unsecured letter of credit exceeded the lending limits beyond which Snead was not authorized to make unsecured loans without the approval of a superior. Snead testified at trial that he issued the letter of credit because of pressure from Pollack and the manager of a Long Beach branch of the Bank who was holding an OGC check until funds would be available to avoid an overdraft.

Snead failed to include any reference to the $90,000 letter of credit in the application for the $5,000,000 line of credit which he had submitted to the Bank's General Loan Committee. There was no evidence at trial that Pollack or Dellamater induced or even knew about the omission.

Subsequently, on several occasions, Snead used his twenty years of experience as an officer of the Bank dealing in letters of credit to issue letters and amendments in favor of Oceantech in an amount totalling approximately $5,000,000. Contemporaneously dated applications for each of the letters and amendments were prepared by Snead and signed by Pollack and Dellamater (except for one $1,840,000 application of which Dellamater had no knowledge). Commercial pro-forma invoices for amounts of lead "at ten cents per pound F.O.B. Panama" to support drawings against the various letters of credit were drafted in Spanish on Oceantech Spanish language stationery, and were signed by Pollack.

During this period, Snead's personal finances, which he had not revealed to Dellamater, were in a precarious state. He had become heavily involved in the stock market and eventually managed to entangle himself in several transactions in which he personally borrowed from, or lent money to, customers for whose accounts he was responsible. Snead subsequently requested and received personal loans from OGC and Oceantech by giving the impression to Dellamater and Pollack that he was using the proceeds to make direct payments to the Bank on behalf of several of his "shakey" accounts.

The salvage operations turned up very little abandoned cable, and that found was of no commercial value. The Bank's net loss, after seizing certain funds of the defendants and venture-related assets, was approximately $2,648,000.

Pollack and Dellamater were convicted by a jury on counts of conspiracy to violate, and counselling and inducing violation of 18 U.S.C. § 1005. The district court ordered re-examination, of Dellamater's books and records to ensure that he had not been wrongly convicted. Apparently the report and hearing on that re-examination satisfied the court that the verdict of guilty should stand. This appeal ensued.

## II.   REQUIREMENT OF INTENT TO INJURE OR DEFRAUD

18 U.S.C. § 1005 provides in pertinent part:

> "Whoever, being an officer, director, agent, or employee of any . . . member bank . . . without authority from the directors of such bank, issues or puts in circulation any notes of such bank; or

> "Whoever, without such authority, makes, draws, issues, puts forth, or assigns any certificate of deposit, draft, order, bill of exchange, acceptance, note, debenture, bond, or other obligation, or mortgage, judgment or decree; or

> "Whoever makes any false entry in any books, report, or statement of such bank *with intent to injure or defraud* such bank . . . company, body, politic or corporate, or any individual person, or to deceive any officer of such bank . . . or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

> "Shall be fined not more that $5,000 or imprisoned not more than five

years, or both . . . . " (Emphasis added)

Pollack and Dellamater contend that "intent to injure or defraud" the Bank was an essential element under 18 U.S.C. § 1005. Since the indictment failed to so charge, and the district court failed to instruct the jury on such intent, they argue that their convictions must be reversed. We agree that the legislative history of § 1005 and the relevant case law compel the conclusion that "intent to injure or defraud" was intended to be an essential element of all three paragraphs of § 1005.

The original predecessor of § 1005 was Rev.Stat. § 5209. Section 5209 was quite similar to the present § 1005, except that the three paragraphs of § 1005, plus an additional crime of embezzlement or willful misapplication of bank funds or credits, were all part of the same paragraph.[1] Further, § 5209 required intent to injure or defraud "in either case," referring to all parts of the section. *See* Evans v. United States, 153 U.S. 584, 592, 14 S.Ct. 934, 38 L.Ed. 830 (1894).

In 1913, Rev.Stat. § 5209 was re-codified as 12 U.S.C. § 592, which again included all parts of the section in a single paragraph, and which required "intent, in any case, to injure or defraud."[2] Then, in 1948, the statute was revised and its contents separated into three separate statutes: 18 U.S.C. §§ 334, 656, and 1005.

Although there is little case law interpreting the revision of 12 U.S.C. § 592 with respect to § 1005, those courts which have considered the elimination of the "intent to injure or defraud" language in § 656,[3] have interpreted such

1. Rev.Stat. § 5209 provided in pertinent part:

"Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree; or who makes any false entry in any book, report, or statement of the association, *with intent, in either case, to injure or defraud* the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten." (Emphasis added)

2. 12 U.S.C. § 592 provided:

"Any officer, director, agent, or employee of . . . a national banking association . . . who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of such . . . national banking association . . . or who, without authority from the directors of such . . . national banking association . . . issues or puts in circulation any of the notes of such

. . . national banking association . . . or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree, or who makes any false entry in any book, report, or statement of such . . . national banking association . . . *with intent in any case to injure or defraud* such . . . national banking association . . . or any other company, body politic or corporate, or any individual person, or to deceive any officer of such . . . national banking association . . . and every receiver of a national banking association who, with like intent to defraud or injure, embezzles, abstracts, purloins, or willfully misapplies any of the moneys, funds, or assets of his trust, and every person who, with like intent, aids or abets any officer, director, agent, employee, or receiver in any violation of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof in any district court of the United States shall be fined not more than $5,000 or shall be imprisoned for not more than five years, or both, in the discretion of the court. * * *" (Emphasis added)

3. 18 U.S.C. § 656 provides in pertinent part:

"Whoever, being an officer, director, agent or employee of, or connected in any capacity with any . . . member bank . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, as-

elimination as an oversight and have held that intent to injure or defraud remains an element of the offense. United States v. Docherty (2 Cir. 1972) 468 F.2d 989, 994–995, Ramirez v. United States (9 Cir. 1963) 318 F.2d 155. The Reviser's Notes to 18 U.S.C. §§ 656 and 1005 both state that the sections "are based on sections 592, 597 of title 12, U.S.C." and that the revisions were intended to clarify and condense "without changing in any way the meaning or substance of existing law."

In *Docherty, supra,* the Second Circuit, citing and relying in part on *Ramirez, supra,* held that the Reviser's Notes indicated an intent to retain the requirement of intent to injure or defraud in § 656, stating:

"In applying the provision of 18 U.S.C. § 656 relating to 'wilful misapplication,' courts must be mindful of its history and avoid undue extension as a result of the ill-conceived work of the 1948 reviser. Until that time the statute, as previously noted, after defining the prohibited acts, had included a requirement of intent 'to injure or defraud' the bank or 'to deceive' a bank officer or agent appointed to examine the affairs of the bank. . . . Some courts, referring to the Reviser's Note, have properly held that intent to injure or defraud remains an element of the offense. . . . Ramirez v. United States, 318 F.2d 155 (9 Cir. 1963). . . . By the same token an intent to deceive remains an alternative mental element. See 18 U.S.C. § 1005." 468 F.2d at 994–995.

In *Ramirez, supra,* this court also considered the legislative history of 12 U.S.C. § 592 and the effects of the recodification into §§ 656 and 1005. The court read an intent to injure or defraud into § 656:

"Despite the omission of these words from the text of section 656, it is

clear that 'an intent to injure or defraud' remains an essential element of any crime under that statute and accordingly must be proved . . . ." (Footnote omitted) 318 F.2d at 158. Congress, in omitting "intent to injure or defraud" in the 1948 Revision, "undoubtedly considered these words to be redundant." *Id. See also* United States v. Wiggenhorn (9 Cir. 1963) 312 F.2d 289; United States v. Tornabene (3 Cir. 1955) 222 F.2d 875, 878.

We hold that 18 U.S.C. § 1005, which, like 18 U.S.C. § 656, was derived from 12 U.S.C. § 592, likewise requires an intent to injure or defraud. Pollack and Dellamater were charged and convicted under the second paragraph of § 1005, which covers any person who, without authority, "makes, draws, issues, puts forth, or assigns" any banking document or obligation. Although the language "with intent to injure or defraud" appears not in this paragraph, but in the third paragraph of § 1005, it was undoubtedly intended as a requirement of all three paragraphs.

Since our Circuit read an intent to injure or defraud into 18 U.S.C. § 656, which concerned an officer, director, agent or employee who embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of a bank, we must also read that requirement into the second paragraph of 18 U.S.C. § 1005, which carries the same penalty for exceeding the authority of an agent of a bank in extending credit. We think that *Ramirez* dictates our decision.

Count 1, charging the conspiracy, did not include intent to injure or defraud as a part of the substantive offense, which was alleged to be the purpose of the conspiracy.

Counts 4 and 6 in substance alleged that Snead "willfully and knowingly" and without authority made and put forth letters of credit and amendments

sets or securities instructed to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee

or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both. . . . "

thereto, and that the defendants "counselled or induced" Snead's offenses. There is no allegation as to Snead's intent to injure or defraud.

■ We hold, for the reasons stated, that Counts 1, 4 and 6 did not allege a federal offense.

In requiring an intent to injure or defraud, we do not rest our decision on Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), where the statutory offense, 18 U.S.C. § 641, had a common law background. There is no such background for banking offenses.

## III.  THE JURY INSTRUCTIONS

■ With respect to Count 1, the conspiracy charge, the district court instructed the jury:

"As to each defendant, you must determine whether he was a conspirator by deciding whether he willfully and intentionally and knowingly joined with any other or others in the alleged conspiracy, and keep in mind specifically that the conspiracy alleged was to bring about the issuance of irrevocable letters of credit which were not authorized by the bank."

This instruction requested the jury to determine whether there was a conspiracy to bring about the issuance of irrevocable letters of credit without authority. At no time did the court instruct that the substantive crime referred to in the conspiracy must include the purpose or intent to injure or defraud.

As to Counts 4 and 6, there was no instruction that the offense alleged to have been committed by Snead (which defendants were alleged to have counselled and induced) contained the element of an intent to injure or defraud.

The instructions, based on the improper indictment, were also erroneous.

## IV.  THE INSUFFICIENCY OF THE EVIDENCE AS TO DELLAMATER

■ The conviction of Dellamater must be reversed for another reason— the insufficiency of the evidence to sustain a conviction on the three charges alleged in Counts 1, 4 and 6.

There is no evidence that Dellamater *counselled or induced* Snead to issue the letters of credit without authority. There is evidence that Dellamater desired the letters of credit to be issued and that he was told by Snead that they had been issued in excess of his authority, but those factors do not constitute counselling or inducing. Customers of banks ordinarily have no knowledge of the authority of an agent of the bank. Even assuming Snead told Dellamater he was exceeding his authorized limits, Dellamater knew many other bank officers or agents were involved in processing the credit and that some were superiors of Snead. The fact that Snead in fact extended the credit was some indication of approval by a superior even though he protested his limited authority.

It seems harsh to convict Dellamater of counselling and inducing the offense by the evidence of his request, desire and acceptance of the credit extended, and without direct evidence to support "counselling and inducing."

With respect to Pollack, on the other hand, there was other evidence: he persuaded Snead to act, and sums of money were made available to Snead through Pollack's accounts. From this the jury could infer that Snead was paid for his wrongful acts.

If the case is retried, the indictment must allege intent to injure or defraud in connection with the alleged wrongful acts. There will therefore be a heavier burden upon the government than that required in the original trial of the present case.

Reversed and remanded.